1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10

11   JEREMY PINSON,                           )   Case No. ED CV 10-811-PSG (SP)
                                             )
12                 Plaintiff,                )   REPORT AND
                                             )   RECOMMENDATION OF UNITED
13          v.                               )   STATES MAGISTRATE JUDGE
                                             )
14   PABLO PRIETO, et al.,                   )
                                             )
15                                           )
                   Defendants.               )
16                                           )
                                             )
17   _____ )

18          This Report and Recommendation is submitted to the Honorable Philip S.

19   Gutierrez, United States District Judge, pursuant to the provisions of 28 U.S.C.

20   § 636 and General Order 05-07 of the United States District Court for the Central

21   District of California.

22                                     **I.**

23                             **INTRODUCTION**

24          On September 17, 2010, plaintiff Jeremy Pinson, a federal prisoner

25   proceeding pro se and in forma pauperis, filed a civil rights complaint pursuant to

26   *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S.

27   388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971).  On August 15, 2011, plaintiff filed

28

1  a First Amended Complaint ("FAC").  The gravamen of the FAC is that while

2  plaintiff was housed at the U.S. Penitentiary at Victorville ("USP Victorville"),

3  various employees of the Bureau of Prisons ("BOP") were deliberately indifferent

4  to his safety and failed to place plaintiff in the segregated housing unit ("SHU"),

5  allowing plaintiff to be assaulted by other inmates in violation of his Eighth

6  Amendment rights.  FAC at 5-11.  The FAC names five defendants: (1) Pablo

7  Prieto, a Correctional Counselor at USP Victorville; (2) Richard Bourn, a Captain

8  at USP Victorville; (3) Josh Halstead, a Special Investigative Services ("SIS")

9  Lieutenant at USP Victorville; (4) Joseph Norwood, the Warden at USP

10  Victorville; and (5) Robert McFadden, BOP Regional Director in Stockton.[1]

11      On September 23, 2013, defendants Halstead, McFadden, Norwood, and

12  Prieto moved for summary judgment ("Ds' MSJ"), as did defendant Bourn

13  ("Bourn's MSJ").  Each motion was accompanied by declarations in support and a

14  Statement of Uncontroverted Facts.  Both motions for summary judgment argue:

15  (1) plaintiff cannot demonstrate that defendants violated his Eighth Amendment

16  rights because he cannot establish that defendants were aware of and ignored a

17  serious risk of harm to plaintiff's safety; and (2) all defendants are entitled to

18  qualified immunity.

19      On October 11, 2013, plaintiff filed a document captioned as an Opposition

20  and Cross-Motion for Summary Judgment ("P's Opp"), but which in fact

21  effectively serves only as an opposition to defendants' summary judgment

22  motions.[2]  Plaintiff's opposition is accompanied by a separate statement of genuine

23  ─────────────────

24      [1]   The FAC originally included three other individual defendants, each of
whom plaintiff voluntarily dismissed from the FAC (docket nos. 70, 73), and the

25  BOP, which the court dismissed from the action on February 1, 2013 (docket no.

26  194).

27      [2]   The cross motion portion consists of one sentence in support of "partial

28  summary judgment" for plaintiff, based solely on defendants' knowledge that

dispute ("P's Statement") and various exhibits in support. Defendants filed their respective replies on December 20, 2013 ("Ds' Reply" and "Bourn's Reply"). Defendants Prieto, Halstead, McFadden, and Norwood also filed objections to most of the exhibits submitted by plaintiff.

For the reasons that follow, the court recommends that defendants' summary judgment motions be denied in part and granted in part. First, there is a genuine dispute as to whether each defendant subjectively knew of and disregarded a serious risk to plaintiff's safety. Second, although the general law concerning the obligations on prison officials to protect inmates from violence at the hands of other inmates was clearly established, the law specifying at what point the risk to an inmate becomes a substantial risk of serious harm was not. In light of the different facts and circumstances applicable to each defendant, the court finds that defendants McFadden and Bourn are entitled to qualified immunity, but defendants Norwood, Prieto, and Halstead are not.

## II.

## ALLEGATIONS OF THE FIRST AMENDED COMPLAINT

In 2007, plaintiff was convicted in federal court and sentenced to 240 months in prison. Plaintiff was initially placed at the United States Penitentiary in Beaumont, Texas ("USP Beaumont") in May 2007. After plaintiff was termed a "snitch" by other inmates and assaulted, he was transferred to the United States Penitentiary in Florence, Colorado ("USP Florence"). At USP Florence, plaintiff engaged in certain gang activity, and then attempted to leave his gang. The BOP denied plaintiff's request for protection. On or about December 12, 2007, plaintiff was beaten unconscious by his cellmate at USP Florence.

plaintiff cooperated with law enforcement. P's Opp at 8. Accepting the truth of this assertion, it does not provide a basis for partial summary judgment in plaintiff's favor, and thus plaintiff's cross motion for summary judgment should be denied.

On February 14, 2008, plaintiff was transferred to USP Victorville. Defendants Norwood and McFadden were responsible for supervising and training staff, and for the security plans at USP Victorville, and they were notified of the details concerning every gang-related assault or murder at the prison. Defendants Bourn and Halstead were responsible for security, and for investigating assaults and reporting to defendants Norwood and McFadden. Defendants Norwood, Bourn, McFadden, and Halstead were aware of illegal activity, including assaults and murders, but failed to investigate or take steps to stop the illegal activity and protect inmates. Defendant Prieto actively assisted the Mexican Mafia in extortion, drug trafficking, and gang activity.

On February 15, 2008, during a classification review, plaintiff warned defendants Bourn and Halstead he would be attacked by his former gang, but they refused to segregate him. Although the gang in his assigned unit was not yet aware of plaintiff's history, plaintiff continued to request protection, but defendants Bourn, Halstead, and Norwood denied his requests.

Plaintiff began to file grievances through defendant Prieto, who became upset by this. Defendant Prieto provided an administrative response discussing plaintiff's sexuality and desire for protection to plaintiff's cellmate, who gave it to the Mexican Mafia. The Mexican Mafia then ordered an assault on plaintiff, which caused "bruises and swelling to plaintiff's face." Defendants Bourn and Norwood observed plaintiff's injuries, but refused protection to plaintiff. Defendant Halstead interviewed plaintiff and took photos of his injuries but refused to place him in the SHU, citing overcrowding.

Shortly thereafter, the Mexican Mafia ordered plaintiff killed. Plaintiff informed staff of the "Luz Verde" ordered on him, but no action was taken to protect plaintiff. On April 9, 2008, after covering the lenses of all unit surveillance cameras, five inmates armed with shanks entered plaintiff's cell and

4

attempted to kill him.  Plaintiff sustained severe injuries, including stab wounds
and broken bones.  Immediately following the assault, defendants Norwood and
Bourn attempted to house plaintiff with a member of the gang that had just
assaulted him; plaintiff refused.

After the assault, plaintiff attempted to help defendants Bourn, Halstead,
and McFadden investigate the assault.  Defendant McFadden rejected plaintiff's
submission.  Defendants Bourn and Halstead interviewed gang allies and falsely
reported on the incident to cover it up.  Defendant Norwood deliberately ignored
plaintiff's pleas to refer the matter to the Federal Bureau of Investigation ("FBI").
No inmates were disciplined for the attempted murder.

In May 2008, plaintiff was transferred from USP Victorville to face an
indictment in Texas.  Plaintiff urged the BOP and staff not to return him to
Victorville and to investigate the gangs responsible for prison crimes, but they
refused his requests.  Agents of the Department of Justice's Office of Inspector
General ("DOJ-OIG") advised BOP they believed plaintiff was in danger.  BOP
refused to separate plaintiff from his gang, or to even consider witness protection
for plaintiff.  As a result, plaintiff continued to be thrust into violent
confrontations with other inmates from 2008 to 2011.

Based upon these allegations, plaintiff claims defendants were deliberately
indifferent to his safety, in violation of the Eighth Amendment.

### III.

### <u>STANDARD OF REVIEW</u>

Under Federal Rule of Civil Procedure 56(a), summary judgment is
appropriate "if the movant shows that there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(a).  A dispute about a material fact is "genuine" only if there is a
sufficient evidentiary basis on which a "reasonable jury could return a verdict for

1  the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106

2  S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *see also Scott v. Harris*, 550 U.S. 372, 380,

3  127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (citation omitted) ("Where the record

4  taken as a whole would not lead a rational trier of fact to find for the non-moving

5  party, there is no genuine issue for trial").  A factual dispute is "material" only if it

6  might affect the outcome of the suit under governing law. *Anderson*, 477 U.S. at

7  248.  All reasonable inferences that may be drawn from the underlying facts must

8  be viewed in the light most favorable to the non-moving party. *Matsushita Elec.*

9  *Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.

10 Ed. 2d 538 (1986).  At the summary judgment stage, the court's function is not to

11 weigh the evidence or determine the truth of the matter, but rather to determine

12 whether there is any genuine issue for trial. *Anderson*, 477 U.S. at 249; *Balint v.*

13 *Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999) (en banc).

14         The moving party bears the initial burden of informing the court of the basis

15 of its motion and identifying admissible evidence it believes demonstrates the

16 absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S.

17 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265  (1986).  If the moving party satisfies

18 its initial burden, Rule 56 requires the party opposing the motion to respond by

19 making a "showing sufficient to establish the existence of an element essential to

20 [his] case, and on which [he] will bear the burden of proof at trial . . . since a

21 complete failure of proof concerning an essential element of [his] case necessarily

22 renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.  In attempting to

23 establish the existence of this factual dispute, the opposing party may not rely

24 upon conclusory allegations or pleading  unsupported by factual data, but is

25 required to tender evidence of specific facts in the form of affidavits, and/or

26 admissible discovery material, in support of its contention that the dispute exists.

27 *See* Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11; *Taylor v. List*, 880

28

6

1    F.2d 1040, 1045 (9th Cir. 1989).

2         In determining any motion for summary judgment or partial summary

3    judgment, the court may assume that the material facts as claimed and adequately

4    supported by the moving party are admitted to exist without controversy except to

5    the extent that such material facts are (a) included in the "Statement of Genuine

6    Disputes" and (b) controverted by declaration or other written evidence filed in

7    opposition to the motion.  Local Rule 56-3.  If a party fails to properly support an

8    assertion of fact or fails to properly address another party's assertion of fact, the

9    court may consider the fact undisputed for purposes of the motion.  Fed. R. Civ. P.

10    56(e)(2).

11                                    **IV.**

12                         **EVIDENTIARY RULINGS**

13         Before addressing the merits of the summary judgment motions, the court

14    must consider defendants' evidentiary objections to plaintiff's exhibits.  On

15    December 20, 2013, defendants filed Objections to Plaintiff's Exhibits ("Ds'

16    Objections"), objecting to 89 of plaintiff's 101 exhibits in support of his

17    opposition to defendants' motions for summary judgment.[3]  A majority of

18    defendants' objections refer to whole exhibits or multiple pages of deposition

19    testimony, without any indication to the court as to which specific portion of the

20    evidence defendants' asserted objection refers to, and on what basis.[4]  Many other

21    objections refer to exhibits that are immaterial to the court's determination of the

22    present summary judgment motions.  Thus, it is not necessary to resolve every

23

24    ───────────────

25    [3]    These objections were filed by defendants Prieto, Halstead, McFadden, and
      Norwood.  Defendant Bourn joined in these objections through his Reply.

26

27    [4]    For example, defendants object to pages 157-165 of plaintiff's deposition
      transcript on the basis of "Lack of foundation, Hearsay," with no further
28    explanation or specificity.  *See* D's Objections at 4.

1    evidentiary issue raised by defendants, especially when the majority lack merit and

2    are raised on questionable grounds.  *See Cholakyan v. Mercedes-Benz, USA, LLC*,

3    281 F.R.D. 534, 550 (C.D. Cal. 2012); *Jimenez v. Domino's Pizza, Inc.*, 238

4    F.R.D. 241, 246 n.1 (C.D. Cal. 2006) ("a strategy of blunderbuss, repetitive,

5    blanket objections" is "an unhelpful diversion").  The court has considered only

6    relevant evidence in connection with this motion, and to the extent the court

7    considers any evidence to which defendants have objected, the court overrules the

8    objection.

9        In the interest of judicial economy, the court details its rulings only with

10   regard to those objections that implicate evidence presenting a genuine dispute of

11   material fact or that otherwise requires further explanation.

12   •  <u>Plaintiff's Exhibit 6 - Declaration of Frank Cabrera</u>: Defendants object to

13       this declaration on grounds of lack of foundation and authentication to

14       establish the document is in fact the declaration of Cabrera, lack of personal

15       knowledge, hearsay, and speculation.  Ds' Objections at 5.  Defendants'

16       objection on the ground that Cabrera's declaration is not authentic is

17       overruled.  Cabrera's declaration meets all of the requirements of a

18       declaration submitted in support of a party's motion.  *See* Fed. Rule Civ.

19       Proc. 56(c)(4); 28 U.S.C. § 1746.  Defendants' challenge to the validity of

20       the signature on the declaration is an issue for the trier of fact.  The court

21       sustains defendants' hearsay objection to the statement in paragraph 2 that

22       the document came from defendant Prieto.  The court overrules defendants'

23       hearsay objection to the comments in paragraphs 6 and 7, as these are not

24       offered for the truth of the matters asserted.  *See* Fed. R. Evid. 801(c).

25   •  <u>Plaintiff's Exhibit 9 - Declaration of Edwin Guzman-Garcia</u>: Defendants

26       object to this declaration on the grounds of relevance, hearsay, and lack of

27       foundation and authentication.  Ds' Objections at 5-6; Ds' Reply at 8.  With

28

regard to foundation and authentication, defendants contend that the
handwritten portion of this declaration and the other form declarations that
are Exhibits 7 and 8 – specifically paragraph 16 of each – appear to be
written in plaintiff's handwriting. *Id.* The court agrees that the handwriting
in all three declarations appears to be the same, but defendants offer no
authority holding this is impermissible. Who prepared the declaration does
not matter; what matters is that the declarant affirms that the information
contained in the declaration is true and correct under penalty of perjury. *See*
28 U.S.C. §1746. Defendants' reliance on this court's August 13, 2013
order denying plaintiff's request to depose inmates in writing is
unpersuasive. *See* Ds' Reply at 8. The court denied plaintiff's request to
have various inmates deposed in writing because plaintiff's proposed plan
for doing so did not comply with Rule 31 of the Federal Rules of Civil
Procedure. Docket no. 267. Rule 31 does not apply to declarations, and
there is no prohibition against handwritten declarations. Accordingly,
defendants' objection to the declaration on the basis on lack of
authentication and foundation is overruled. The court sustains defendants'
hearsay objection with regard to the following statement: "In March 2008
while housed at USP Atwater another Sureno received a letter from a third
party coming from Jose Garcia a Mexican mafia member at USP Victorville
asking that all Surenos be quietly asked if Jeremy Pinson was a snitch and if
anyone had proof." *See* Fed. R. Evid. 801. The court overrules defendants'
objection to, and considers, Guzman-Garcia's statement that he "sent a letter
to Regional Director McFadden warning him that Pinson was going to be
killed soon," which is not hearsay as it is not offered for the truth of the
matter asserted in the letter, but instead for its effect on defendant
McFadden. *See* Fed. R. Evid. 801(c); *U.S. v. Payne*, 944 F.2d 1458, 1472

9

(9th Cir. 1991).

• <u>Plaintiff's Exhibit 10 - Declaration of Debra Pinson</u>: Defendants object to this declaration on the grounds of lack of authentication and foundation sufficient to establish the declaration was executed by the purported declarant, hearsay, and relevance.  Ds' Objections at 6; Ds' Reply at 8.  In her declaration, Debra Pinson states that she telephoned defendants Prieto, Bourn, and Norwood and informed them of conversations that she had with her son – "my son began expressing to me in letters that he suspected that prison gangs were going to kill him" and "my son informed me he'd been assaulted."  These statements are relevant in terms of their effect on the listeners, not for the truth of the matter asserted, so they are not hearsay. *See* Fed. R. Evid. 801(c); *Payne*, 944 F.2d at 1472.  Defendants' contention that there is a "[l]ack of authentication and lack of foundation to establish that the document is in fact the declaration of Debra Pinson" is not well taken, for the reasons already discussed above.  See 28 U.S.C. § 1746.  Accordingly defendants' objection on this ground is overruled.

• <u>Plaintiff's Exhibits 50-52 - Letters to Defendant McFadden</u>:  Defendants object to three letters that plaintiff allegedly wrote to defendant McFadden, on the grounds that these letters lack authentication and foundation to establish that they are genuinely letters from plaintiff to defendant McFadden.  Ds' Objections at 3, 8.  Authentication is a "condition precedent to admissibility," which may be satisfied by "evidence sufficient to support a finding that the matter in question is what the proponent claims."  Fed. R. Evid. 901(a).  Documents attached as evidence in support of or opposition to summary judgment, such as Plaintiff's Exhibits 50-52 here, may be authenticated by a review of their contents to determine whether they appear to be "sufficiently genuine."  *See Las Vegas, LLC v.*

1    *Nehme*, 632 F.3d 526, 533 (9th Cir. 2011) (citing *Orr v. Bank of America,*

2    *NT & SA*, 285 F.3d 764, 778 n.24 (9th Cir. 2002)).  Here, plaintiff testified

3    that he wrote the three letters in issue, on the dates alleged, to defendant

4    McFadden.  Lee Decl., Ex. 5 at 102-05.  Defendants have offered no

5    evidence to the contrary.  Thus, at this stage plaintiff's testimony is

6    sufficient to authenticate the letters.  *See* Fed. R. Evid. 901(a)(1) (testimony

7    of a witness with knowledge is evidence sufficient to support a finding the

8    item is what the proponent claims).  Accordingly, defendants' objections to

9    these exhibits are overruled.

10  •   Plaintiff's Material Disputed Fact No. 11, citing to Plaintiff's Deposition

11      Transcript at 108, 138, 139: Defendants object to the deposition testimony

12      that plaintiff cites in support of Material Disputed Fact No. 11 (P's

13      Statement at 6) on the grounds of lack of foundation, hearsay, and

14      speculation. D's Objections at 4.  Plaintiff's testimony regarding what

15      inmate Pressler told him (Lee Decl., Ex. 5 at 138-39) is hearsay without any

16      applicable exception, and thus defendants' objection to this testimony is

17      sustained.  Plaintiff's testimony regarding what defendant Prieto told him

18      (Lee Decl., Ex. 5 at 139) is an admission of a party opponent (Fed. R. Evid.

19      801(d)(2)), and thus defendants' objection to this testimony is overruled.

20                                                **V.**

21                                         **DISCUSSION**

22  **A.    Genuine Issues of Material Fact Exist With Regard to Plaintiff's**

23        **Deliberate Indifference Claim Against Defendants**

24        Plaintiff alleges that defendants were deliberately indifferent to his safety by

25  failing to place him in segregated housing after he repeatedly expressed a fear of

26  an assault by his former gang, thereby allowing him to be assaulted, in violation of

27  his Eighth Amendment rights.  FAC at 5-11.

28

                                                11

1    "[T]he treatment a prisoner receives in prison and the conditions under

2  which he is confined are subject to scrutiny under the Eighth Amendment."

3  *Helling v. McKinney*, 509 U.S. 25, 31, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993).

4  The Eighth Amendment imposes a duty on prison officials to "take reasonable

5  measures to guarantee the safety of inmates," including "protect[ing] prisoners

6  from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825,

7  832-33, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (internal quotation and

8  citations omitted).  Courts have consistently held that prison officials violate the

9  Eighth Amendment only when two requirements are met.  First, the deprivation or

10  harm suffered by the prisoner must have been objectively "sufficiently serious,"

11  that is, "the inmate must show that he is incarcerated under conditions posing a

12  substantial risk of serious harm." *Farmer*, 511 U.S. at 834 (citations omitted).

13  Second, the prisoner must show that the official had a "sufficiently culpable state

14  of mind" – the state of mind being "deliberate indifference." *Id.*  To meet the

15  subjective requirement of "deliberate indifference," the inmate must show that

16  "the official [knew] of and disregard[ed] an excessive risk to inmate health or

17  safety; the official must both be aware of facts from which the inference could be

18  drawn that a substantial risk of serious harm exists, and [the official] must also

19  draw the inference." *Id.* at 837.  Mere negligence on the part of the official is not

20  sufficient to establish liability; but rather, the official's conduct must have been

21  wanton. *Id.* at 835.

22    Furthermore, when a prisoner seeks to hold individual defendants

23  personally liable for damages, he must establish that the actions or inactions of

24  each individual defendant caused his alleged deprivation. *Leer v. Murphy*, 844

25  F.2d 628, 633 (9th Cir. 1988).  In determining the causation issue, the court must

26  focus on the duties and responsibilities of each individual defendant. *Id.*  The

27  inquiry is "whether the individual defendant was in a position to take steps to avert

28

1  the [violent] incident, but failed to do so intentionally or with deliberate

2  indifference." *Id.* "Sweeping conclusory allegations will not suffice to prevent

3  summary judgment" – the prisoner must establish fault by setting forth "specific

4  facts as to each individual defendant's deliberate indifference." *Id.* at 634.  This is

5  especially true when a prisoner seeks to hold a prison employee individually liable

6  for injuries suffered at the hands of another inmate. *Id.* (citing *Berg v. Kincheloe*,

7  794 F.2d 457, 460 (9th Cir. 1986)).

8      First, with regard to the objective prong of the *Farmer* test, a review of the

9  record reveals that plaintiff has provided sufficient evidence to establish that he

10  faced a "substantial risk of serious harm." *See Farmer*, 511 U.S. at 834.  The

11  evidence establishes that plaintiff was assaulted on April 9, 2008 by other inmates.

12  FAC at 11; Ds' MSJ at 4; P's Ex. 39.  Although the parties dispute the extent of

13  plaintiff's resulting injuries (*see* P's Statement at 4), the medical report indicates

14  that plaintiff suffered a laceration to the face requiring 7-8 sutures, multiple

15  bruises and redness on the body, and had limited mobility on his left side.  P's Exs.

16  39.  Photos taken immediately after the assault appear to corroborate this medical

17  report.  P's Ex. 37.  "Being violently assaulted in prison is simply not part of the

18  penalty that criminal offenders pay for their offenses against society." *Farmer*,

19  511 U.S. at 834 (internal quotation and citation omitted).

20      Of course, the question is not whether plaintiff in fact suffered serious harm,

21  but whether he faced a substantial risk of serious harm prior to the April 9, 2008

22  assault.  There is evidence in the record indicating that the risk to plaintiff was

23  substantial, including evidence (much of it disputed) that: plaintiff's intake

24  screening form at USP Victorville stated he had previously assisted law

25  enforcement and was a CIM case (Lee Decl., Ex. 3 at 4);[5] although not stated on

26

27  ⁵  "CIM case" refers to an inmate in the Central Inmate Monitoring system.
28  28 C.F.R. § 524.70.  Such inmates require a higher level of review prior to

his intake screening form, plaintiff was a former gang member and told staff this

during his USP Victorville intake (Lee Decl., Ex. 5 at 174); prison administrative

remedy forms stated plaintiff was a homosexual who had assisted law enforcement

in the past (P's Exs. 11-16), and defendant Prieto provided one of these forms to

plaintiff's cellmate (Lee Decl., Ex. 5 at 138-39); and plaintiff was actually

assaulted in late March 2008 (*id.* at 173). This evidence is sufficient to create a

triable issue of fact as to the first, objective prong of the *Farmer* test.

The key issue is whether the defendants were subjectively aware of the

serious risk to plaintiff's safety and deliberately ignored such a risk. In

considering this issue, the court discusses the undisputed and disputed facts in the

record with respect to each defendant below.

### 1.    Defendant McFadden

Defendant McFadden was BOP Regional Director in Stockton. In the FAC,

plaintiff contends that defendant McFadden failed to properly train and supervise

staff, failed to implement proper security plans, and knew of illegal activity and

assaults in furtherance thereof. *See* FAC at 8.

As an initial matter, to the extent plaintiff attempts to hold defendant

McFadden liable under a theory of *respondeat superior*, his claim must fail.

*Ashcroft v. Iqbal*, 556 U.S. 662, 676-77 (2009) ("Government officials may not be

held liable for the unconstitutional conduct of their subordinates under a theory of

*respondeat superior*" in an action brought under 42 U.S.C. § 1983). Instead,

"plaintiff must plead that each Government official defendant, through the

official's own individual actions, has violated the Constitution." *Id.* at 676.

Although plaintiff's claims in the FAC appear to stem, in part, from defendant

McFadden's supervisory role (*see* FAC at 8), plaintiff maintains that his

allegations against each individual are based on the defendants' personal

_____

transfer, temporary release, and/or community programs, for safety purposes. *Id.*

1  participation in the deprivation of his constitutional rights.  P's Opp at 6.  It

2  appears that the crux of plaintiff's claims against defendant McFadden is that

3  defendant McFadden knew that plaintiff was in danger of being assaulted and

4  failed to protect him.  Lee Decl., Ex. 5 at 149-151.

5      Defendants contend that plaintiff's allegations are too vague to make out a

6  claim against defendant McFadden, and maintain that defendant McFadden had no

7  contact with plaintiff that would put him on notice of a serious risk to plaintiff's

8  safety.  Ds' MSJ at 15-16 (citing McFadden Decl. at 3, ¶8).  But plaintiff provides

9  evidence that, when viewed in the light most favorable to plaintiff, presents a

10  genuine issue of material fact as to what notice defendant McFadden had

11  regarding the danger plaintiff faced.  During his deposition, plaintiff testified that

12  he wrote letters to defendant McFadden on February 22, 2008, March 8, 2008, and

13  April 2, 2008, indicating his fear for his safety in light of his designation as a

14  "snitch" within the prison system, and detailing past assaults at prior institutions.

15  Lee Decl., Ex. 5 at 102-05.  Copies of these letters were included in plaintiff's

16  exhibits.  P's Ex. 50-52.  In addition to these letters, plaintiff also provides a

17  declaration from Edwin Guzman-Garcia, an inmate at USP Atwater, stating that

18  Guzman-Garcia wrote a letter to defendant McFadden, alerting him that plaintiff

19  would be killed soon.  P's Ex. 9.  Finally, plaintiff testified that he submitted a BP-

20  9 administrative remedy form to defendant McFadden (Lee Decl., Ex. 5 at 106),

21  although plaintiff does not elaborate as to what this form encompassed, nor does

22  he include a copy.

23      Of course, unlike the other named defendants, defendant McFadden did not

24  work at USP Victorville; he was in Stockton, quite removed from plaintiff.  Thus,

25  there is a real question as to whether a failure to intervene from Stockton based on

26  the information given to him could constitute deliberate indifference.  This will be

27  discussed further below with respect to qualified immunity.  At this step, however,

28

the court finds the evidence provided by plaintiff – plaintiff's deposition

testimony, copies of the letters to defendant McFadden, and the declaration of

Edwin Guzman-Garcia – presents a triable issue as to whether defendant

McFadden was, in fact, subjectively aware of the risk to plaintiff's safety and

failed to take appropriate measures to abate it.  *See Farmer*, 511 U.S. at 837-38.

### 2.    Defendant Norwood

Defendant Norwood was the Warden at USP Victorville.  Plaintiff claims

that Defendant Norwood, like defendant McFadden, failed to properly train and

supervise staff, failed to implement proper security plans, and knew of illegal

activity and assaults in furtherance thereof.  FAC at 8-9.  Additionally, plaintiff

alleges that defendant Norwood observed plaintiff's injuries following his first

assault, but failed to protect him.  *Id.* at 10.  Defendants contend that plaintiff has

not, and cannot, show that defendant Norwood was subjectively aware of a serious

risk to plaintiff's safety.  Ds' MSJ at 16-17.

Defendant Norwood denies that he received any information prior to the

assault suggesting that plaintiff was in danger.  Norwood Decl. ¶ 14.  But plaintiff

submits evidence that, when viewed in the light most favorable to plaintiff,

demonstrates a genuine issue of material fact as to defendant Norwood's

subjective knowledge.  In support of his claim that defendant Norwood was aware

of a risk to plaintiff, plaintiff offers evidence in the form of his own deposition

testimony (Lee Decl., Ex. 5 at 156-62), a declaration from his mother, Debra

Pinson (P's Ex. 10), and a letter from his former attorney, Julia Summers, to

defendant Norwood (P's Ex. 35).  Plaintiff offers no evidence in support of his

claim that defendant Norwood witnessed injuries following a prior assault.[6]

---

[6]   Plaintiff cites to his deposition testimony (Lee Decl., Ex. 5 at 163, lines 6-
10) for support.  P's Statement at 5.  But the portion of the deposition transcript
plaintiff cites does not stand for the proposition asserted.

1    The letter from Julia Summers that plaintiff provides is dated May 12, 2008.

2    P's Ex. 35.  Because the letter was sent after the April 9, 2008 assault, it is

3    immaterial to whether defendant Norwood subjectively knew of a risk to

4    plaintiff's safety and ignored it during the relevant time period.[7]  But the

5    remaining evidence offered by plaintiff is sufficient to raise a genuine issue of

6    material fact.

7    During his deposition, plaintiff testified that he spoke with defendant

8    Norwood on approximately five occasions.  Lee Decl., Ex. 5 at 160.  Plaintiff

9    testified that he informed defendant Norwood that he had been assaulted in prior

10   institutions, that his counselor, defendant Prieto, was not responding to his BP-8

11   form, and that an attack on his life was inevitable based on his prior cooperation

12   with law enforcement and the fact that his former gang was seeking to verify that

13   information.  *Id.* at 160-61.  According to plaintiff, he and defendant Norwood had

14   heated conversations regarding plaintiff's request to be placed in the SHU, and

15   whether such placement could be done prior to an assault or only after an assault

16   actually took place.  *Id.* at 161-62.  Additionally, plaintiff's mother, Debra Pinson,

17   submitted a declaration stating that she called and spoke to defendant Norwood

18   (and other BOP staff) in early March 2008 and informed him that her son was in

19   danger.  P's Ex. 10.  She was told that defendant Norwood would "look into it."

20   *Id.*

21   Thus, it is clear from the parties' papers that a genuine dispute exists as to

22   whether defendant Norwood was in fact aware of a risk to plaintiff's safety.

23

24   _____

25   [7]    Plaintiff raises numerous claims regarding the defendants' alleged actions
26   after his assault, but these claims are immaterial to the defendants' subjective
     knowledge during the relevant time period for Eighth Amendment purposes, and
27   thus raise no genuine issue.  *See Anderson*, 477 U.S. at 248.  Accordingly, the
28   court does not address these claims.

1

### 3. Defendant Prieto

2     Defendant Prieto was a correctional counselor at USP Victorville. Plaintiff

3 contends that defendant Prieto actively assisted the Mexican Mafia in extortion,

4 drug trafficking, and gang activity. FAC at 10. To this end, plaintiff alleges,

5 Prieto gave a copy of plaintiff's Central Office Appeal and Response – in

6 connection with an appeal plaintiff had filed while at USP Florence that discussed

7 plaintiff's sexual orientation and desire for protection – to plaintiff's cellmate,

8 Sidney Green. *Id.* Green subsequently gave the information to the Mexican

9 Mafia, who ordered an assault on plaintiff. *Id.* The assault took place in a cell in

10 unit 6B, and resulted in bruises and swelling to plaintiff face. *Id.* Thereafter, the

11 Mexican Mafia ordered plaintiff killed. *Id.* It is on this basis that plaintiff

12 believes Prieto violated his Eighth Amendment rights. Lee Decl., Ex. 5 at 135.

13 Defendants contend there is no evidence that defendant Prieto received a copy of

14 the administrative remedy to which plaintiff refers, provided it to plaintiff's

15 cellmate, or had any knowledge of any threats being made against plaintiff. Ds'

16 MSJ at 21-22; Prieto Decl., ¶¶ 10(d), 13-14.

17     The court notes that plaintiff testified the administrative remedy form he

18 claims defendant Prieto gave to his cellmate was "the central office appeal

19 response." Lee Decl., Ex. 5 at 137. This response is dated March 14, 2008 and

20 notes plaintiff had been designated to USP Victorville, so it would have been the

21 response that arrived at USP Victorville during the relevant period. *See* P's Ex.

22 16. The response itself makes no mention of plaintiff's homosexuality or

23 cooperation with law enforcement; it simply discusses plaintiff's request for a

24 prison transfer. *Id.* If this was the only document provided to plaintiff's cellmate,

25 it would not have endangered plaintiff's safety. What is unclear from the record is

26 whether the response returned to plaintiff would have included the appeal plaintiff

27 submitted. In that appeal plaintiff stated he is gay and had aided law enforcement.

28

P's Ex. 15.  Inmate Frank Cabrera claims to have seen the response, and that it discussed plaintiff "being a Homosexual and assisting Police."  P's Ex. 6, ¶ 2.  Thus, there is evidence in the record that the response included information that would have endangered plaintiff's safety had it been circulated in the prison.

In support of his claim that defendant Prieto facilitated the assault, plaintiff provides Cabrera's declaration, which indicates that another inmate showed him a copy of plaintiff's administrative remedy request response, and indicated that he had obtained it from defendant Prieto.  *Id.*  As set forth above, the claim by inmate Cabrera that this document came from defendant Prieto is hearsay, so the court does not consider it.[8]  But the court does consider Cabrera's declaration insofar as he states that, following the April 2008 assault on plaintiff, defendant Prieto told plaintiff, "See what happens when you write so much shit."  P's Ex. 6, ¶ 6.  In addition, the court considers plaintiff's deposition testimony that defendant Prieto admitted to him that Prieto had given plaintiff's cellmate the administrate remedy response.  Lee Decl., Ex. 5 at 138-39.  Plaintiff testified that when Prieto admitted this to him: "He [Prieto] told me that he had told me before that I needed to be careful what I wrote because I could end up in a bag."  *Id.* at 138.

The court also considers defendant Prieto's own declaration, which reveals that he was exposed to information indicating a potential risk to plaintiff's safety.  Defendant Prieto acknowledges that, as a counselor, he had access to inmates' Central Files, which included, among other things, an inmate's "background, convictions and institutional adjustment."  Prieto Decl., ¶ 9.  Plaintiff's Central File contains a Presentence Investigation Report, as well as plaintiff's intake forms from July 13, 2006 through May 29, 2008.  *Id.*, ¶ 10.  According to defendant

---

[8]    Plaintiff also testifies that there are inmate affidavits that support his claim (Lee Decl., Ex. 5 at 138), but the court is unable to find such affidavits in the exhibits provided by plaintiff, or anywhere in the record.

1   Prieto, these intake forms reveal that "at no time prior to April 9, 2008 did Mr.

2   Pinson . . . provide any [] basis for concluding that he could not be safely housed

3   in USP Victorville's general population." *Id.*, ¶ 10(d).  Defendant Prieto relies on

4   the fact that plaintiff never indicated that he was a gang member.  Ds' MSJ at 20;

5   Prieto Decl., ¶ 10.  But as plaintiff notes, the intake form that plaintiff filled out

6   upon his arrival at USP Victorville on February 14, 2008, which defendant Prieto

7   admittedly used to screen incoming inmates (Prieto Decl., ¶ 10(b)), indicates that

8   plaintiff had assisted law enforcement, that he was a CIM case, and that he had

9   testified against someone in court. Lee Decl., Ex. 3 at 4; Prieto Decl., Ex. A at 7.

10  Additionally, although plaintiff stated on the form he knew of no reason he should

11  not be placed in general population, staff completing the form indicated that

12  plaintiff was *not* "OK for general population," with a note that it was a matter for

13  the Captain's review. *Id.*; *see* P's Ex. 5 at 6 ("Defendant [Norwood] admits that

14  the interviewer did not approve the Plaintiff for housing in the institution's general

15  population but instead referred the matter to the Captain for a further review.").

16      The evidence in support of plaintiff's claim that defendant Prieto took

17  actions that may have helped to instigate his assault in conjunction with the

18  evidence that defendant Prieto was exposed to information tending to indicate

19  plaintiff's unsuitability for general population housing raises a genuine issue of

20  material fact as to whether defendant Prieto violated his Eighth Amendment rights.

21  Defendants argue plaintiff cannot show causation because plaintiff admits his

22  cellmate, who allegedly received the administrative remedy response from

23  defendant Prieto, did not know he was going to be assaulted. *See* Lee Decl., Ex. 5

24  at 117.  That plaintiff's cellmate was not involved in the assault does not absolve

25  defendant Prieto of liability.  Causation is still present if the administrative remedy

26  response played a role, and plaintiff has submitted evidence that another prisoner

27  saw the response, suggesting it was circulating through the prison. *See* P's Ex. 6,

28

1    ¶ 2.  Accordingly, whether defendant Prieto violated plaintiff's Eighth
2    Amendment rights is a triable issue.

3        **4.    Defendant Halstead**

4        Defendant Halstead was an SIS Lieutenant at USP Victorville.  Plaintiff's
5    claim against defendant Halstead stems from defendant Halstead's responsibility
6    for security at USP Victorville, specifically for "investigating illegal activity and
7    assault and reporting that information to defendants Norwood and McFadden."
8    FAC at 8-10.  The crux of plaintiff's claim against defendant Halstead appears to
9    be that defendants Halstead and Bourn conducted a classification review of
10   plaintiff upon his arrival at USP Victorville on February 15, 2008, and they
11   refused to place plaintiff in segregated housing despite plaintiff's warnings that he
12   would be attacked by his former gang because of his government cooperation.
13   FAC at 9-10; Lee Decl., Ex. 5 at 173-78.  Plaintiff also alleges that defendant
14   Halstead interviewed and photographed plaintiff following an assault that took
15   place in late March 2008, but again refused to place plaintiff in segregation.  FAC
16   at 10; Lee Decl., Ex. 5 at 173-74.  Defendants deny that plaintiff made any
17   mention of a safety risk during his intake interview, that defendant Halstead was
18   aware of any assault on plaintiff prior to the April 9, 2008 assault, and that
19   defendant Halstead had any information that would put him on notice of a risk to
20   plaintiff's safety prior to the April 9, 2008.  Ds' MSJ at 18-20.

21       It is undisputed that defendant Halstead participated in a classification
22   review of plaintiff upon his arrival at USP Victorville.  FAC at 9; Halstead Decl.,
23   ¶ 7.  But the parties disagree as to what transpired during that review, and what
24   defendant Halstead's responsibility was.  During his deposition, plaintiff testified
25   that he told defendant Halstead during his intake classification review that
26   members of his former gang would assault him or have him killed because of his
27   prior government cooperation if he was housed in the general population, but was

28

21

1  told that no action would be taken unless or until plaintiff was actually assaulted.

2  Lee Decl., Ex. 5 at 173-75.

3      Plaintiff further testified that he was assaulted in late March 2008, after

4  which defendant Halstead took photos of the injuries and interviewed plaintiff and

5  others. *Id.* at 173-74.  Plaintiff did not testify that he told defendant Halstead he

6  was assaulted; he instead asserted defendant Halstead must have been aware he

7  was assaulted because another officer "provided copies of both a letter I [plaintiff]

8  had written to my mom notifying her of the assault, and a letter written by Bradley

9  Stone identifying some unknown third party that I was going to be assaulted

10  again." *Id.*  Plaintiff testified that following that assault, defendant Halstead

11  interviewed him and inmate Stone, and plaintiff again requested to be placed in

12  segregated housing and was again denied.  *Id.* at 174.

13      In addition to the above evidence offered by plaintiff, defendants' papers

14  make clear that defendant Halstead, like defendant Prieto, reviewed plaintiff's

15  Central File (Ds' MSJ at 18-19; Halstead Decl.,  ¶ 7), which contained information

16  that plaintiff had assisted law enforcement, that he was a CIM case, that he had

17  testified against someone in court, and that he was not OK for general population

18  pending Captain's review.  Lee Decl., Ex. 3 at 4.  Defendant Halstead's exposure

19  to this information, coupled with plaintiff's testimony about what he told Halstead,

20  is sufficient to create a triable issue as to whether defendant Halstead had

21  knowledge of the risk to plaintiff. *See Farmer*, 511 U.S. at 842-43.

22      Lastly, Halstead  refutes plaintiff's allegations that he refused to place

23  plaintiff in segregated housing on the basis that defendant Halstead "did not assign

24  inmates to housing units."  Ds' MSJ at 19; Halstead Decl. at 2.  To the extent

25  defendant Halstead contends that this relieves him of any duty to protect inmates

26  from harm at the hands of other inmates, this argument is unpersuasive. *Cf.*

27  *Longoria v. Texas*, 473 F.3d 586, 593 (5th Cir. 2006) (finding defendant who was

28

22

1  not responsible for inmate housing fulfilled Eighth Amendment duty to protect by

2  referring inmate's complaints for further investigation or administrative action).

3       **5.  Defendant Bourn**

4       Defendant Bourn was a Captain at USP Victorville.  Plaintiff contends that

5  defendant Bourn, like defendant Halstead, was responsible for security at USP

6  Victorville, specifically for "investigating illegal activity and assault and reporting

7  that information to defendants Norwood and McFadden."  FAC at 8-10.

8  Specifically, plaintiff appears to claim that defendant Bourn violated his Eighth

9  Amendment rights by failing to place him in segregated housing after plaintiff

10 warned him of the immediate risks to his safety.  *See id.*; P's Opp at 5; P's

11 Statement at 7-8.  Defendant Bourn contends that there is no evidence that he was

12 aware of any risk to plaintiff, "serious or otherwise," of an assault by another

13 inmate.  Bourn's MSJ at 8.  But the fact that defendant Bourn denies that plaintiff

14 ever communicated a fear for his safety, when plaintiff claims otherwise,

15 demonstrates that there is a triable issue of fact.  Contrary to defendant Bourn's

16 assertion that plaintiff has provided no evidence to support his claims, plaintiff has

17 provided evidence, which, when viewed in the light most favorable to plaintiff,

18 raises a genuine issue as to defendant Bourn's subjective awareness of a serious

19 risk to plaintiff's safety.

20      Plaintiff claims that he spoke with defendant Bourn on eight different

21 occasions about his concerns with the Mexican Mafia.  P's Statement at 7.  But

22 plaintiff provides evidence, in the form of his deposition testimony, for only two

23 of these occasions, one of which occurred after the April 9, 2008 assault.  Lee

24 Decl., Ex. 5 at 190-92.  The sole pre-assault conversation was during his intake

25 classification review.  *Id.*  As discussed with regard to defendant Halstead above,

26 plaintiff testified that he communicated his concerns for his safety during his

27 classification review.  *Id.* at 190-91.  In addition, Debra Pinson submitted a

28

1   declaration, stating that she telephoned defendant Bourn and conveyed her

2   concerns for her son's safety in early March 2008. P's Ex. 10. Although it is a

3   close question, this is sufficient to at least create a triable issue as to whether

4   defendant Bourn was aware of a serious risk to plaintiff's safety.

5       Defendant Bourn, like defendant Halstead, states that he was "not involved

6   in identifying a specific cell to house Mr. Pinson while he was at USP Victorville"

7   and "was not involved in assigning cellmates, if any, for Mr. Pinson while he was

8   at USP Victorville." Bourn's MSJ, Ex. A at 57. As discussed above, while this

9   may be true, it does not absolve defendant Bourn of any responsibility to act to

10  protect the inmates of USP Victorville pursuant to the Eighth Amendment.

11      In sum, for all defendants, there are triable issues of fact as to whether

12  defendants violated plaintiff's Eighth Amendment rights by failing to place

13  plaintiff in the SHU or take other precautions in deliberate indifference to his

14  safety. The question remains, however, whether defendants are entitled to

15  qualified immunity.

16  **B.    Some But Not All Defendants Should Prevail on Their Summary**

17  **Judgement Motions Due to Qualified Immunity**

18      Defendants contend that, even if the court finds the undisputed facts make

19  out a constitutional violation, they are each entitled to qualified immunity. D's

20  MSJ at 22-25; Bourn's MSJ 12-17. Plaintiff has brought his claims under 42

21  U.S.C. § 1983. "Section 1983 creates a private right of action against individuals

22  who, acting under color of state law, violate federal constitutional or statutory

23  rights." *Hall v. City of Los Angeles,* 697 F.3d 1059, 1068 (9th Cir. 2012) (quoting

24  *Deveraux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001). But government

25  officials sued pursuant to § 1983 may be entitled to qualified immunity.

26      "The doctrine of qualified immunity protects government officials 'from

27  liability for civil damages insofar as their conduct does not violate clearly

28

1    established statutory or constitutional rights of which a reasonable person would

2    have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L.

3    Ed. 2d 565 (2009) (citation omitted).  "[Q]ualified immunity shields the arresting

4    officer from suit when he or she 'makes a decision that, even if constitutionally

5    deficient, reasonably misapprehends the law governing the circumstances.'" *Smith*

6    *v. Almada,* 640 F.3d 931, 937 (9th Cir. 2011) (quoting *Brosseau v. Haugen,* 543

7    U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004)).  Qualified immunity

8    protects "all but the plainly incompetent or those who knowingly violate the law."

9    *Malley v. Briggs,* 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986).

10         When determining if a defendant is entitled to qualified immunity, the court

11   must conduct a two-step test as pronounced by the Supreme Court in *Saucier v.*

12   *Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), *overruled in part*

13   *on other grounds by Pearson*, 555 U.S. at 236.  The prongs may be analyzed in the

14   order selected by the court.  *Pearson*, 555 U.S. at 236.  To survive a claim of

15   qualified immunity, a plaintiff must show that the official's actions violated a

16   constitutional right, and that the right was "clearly established" at the time of the

17   conduct at issue.  *Nelson v. City of Davis*, 685 F.3d 867, 875 (9th Cir. 2012).

18        If the official's actions did not violate a constitutional right, there is no

19   violation of § 1983 and qualified immunity is not implicated.  *Lacey v. Maricopa*

20   *County*, 693 F.3d 896, 915 (9th Cir. 2012).  If the official violates a constitutional

21   right, but that right was not "clearly established," then the official is protected by

22   qualified immunity.  *Id.*  "Only when an officer's conduct violates a clearly

23   established constitutional right – when the officer should have known he was

24   violating the Constitution – does he forfeit qualified immunity."  *Id.*

25        The first prong of the qualified immunity analysis is whether the plaintiff

26   has shown the defendants violated a constitutional right.  As discussed at length

27   above, the court has found defendants have failed to show there is no triable issue

28

25

as to whether they were deliberately indifferent to a serious risk to plaintiff's safety.  Taking the facts in the light most favorable to the plaintiff, the facts are sufficient to establish that defendants violated plaintiff's constitutional rights under the Eighth Amendment.  *See Saucier*, 533 U.S. at 201.

Having determined that defendants' actions or inaction may be found to have violated the Constitution, the court next asks whether the constitutional right violated was clearly established at the time.  *See Saucier*, 533 U.S. at 201.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.*  "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. "  *Reichle v. Howards*, __ U.S. __, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012) (internal quotations and citations omitted).  In other words, "existing precedent must have placed the statutory or constitutional question beyond debate."  *Ashcroft v. al-Kidd*, __ U.S. __,131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011).  "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  *Saucier*, 533 U.S. at 202.

In determining whether a right is clearly established, the court considers Ninth Circuit and Supreme Court law and, absent binding precedent, the law of other circuits at the time of the alleged incident.  *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996).  The rule that a prison official cannot deliberately disregard a substantial risk of serious harm to an inmate has long been clearly established.  *See Farmer*, 511 U.S. at 832-33; *Norwood v. Vance*, 529 F.3d 1062, 1069 (9th Cir. 2009).  But no prior United States Supreme Court or Ninth Circuit case has addressed the more particularized inquiry: "at what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes."  *Estate of Ford*

1    *v. Ramirez-Palmer*, 301 F.3d 1043 (9th Cir. 2002) (citing *Farmer*, 511 U.S. at 834

2    n.3).  Defendants rely on the absence of on-point precedent, citing *Ford* for the

3    conclusion that here, it would not be clear to a reasonable prison official when the

4    risk of harm shifted from "some harm" to a "substantial risk of serious harm."  Ds'

5    MSJ at 24 (citing *Ford*, 301 F.3d at 1050-51); Bourn's MSJ at 16 (citing *Ford*,

6    301 F.3d at 1051).[9]

7       But the lack of authority directly on point is insufficient by itself to entitle

8    defendants to qualified immunity.  Notwithstanding the absence of precedent

9    directly on point, the law may still be clearly established.  *Anderson v. Creighton*,

10   483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).  In order to show

11   that a right is clearly established, plaintiff need not establish that the officers'

12   conduct had been previously declared unconstitutional, "only that the

13   unlawfulness was apparent in light of pre-exiting law."  *Nelson v. City of Davis*,

14   685 F.3d 867, 883-84 (9th Cir. 2012) (quoting *Jensen v. City of Oxnard*, 145 F.3d

15   1078, 1085 (9th Cir. 1998) (internal quotation and citation omitted)).  Because the

16   facts and circumstances are different for each defendant, the court again discusses

17   each defendant separately below to decide whether, taking the facts in the light

18   most favorable to plaintiff, whether the law was clearly established at the time so

19   as to place the defendant on notice that his conduct was unlawful.

20       **1.    Defendant McFadden Is Entitled to Qualified Immunity**

21       The evidence plaintiff presents to support his claim that defendant

22   McFadden was subjectively aware that plaintiff faced a substantial risk of serious

23   harm is: (1) his testimony that he sent McFadden three letters saying he has been

24

25      [9]    The additional case law provided by defendant Bourn is unpersuasive, as

26   each cited holding is premised on an official's lack of knowledge of a risk, or a
     plaintiff's failure to warn officials of the risk.  *See* Bourn's MSJ at 16-17 n.8.

27   Conversely here, as discussed at length above, a material dispute exists regarding

28   each defendants' subjective awareness of risk.

1   labeled a snitch, he was assaulted at USP Florence for this reason, he was just (in

2   late March 2008) assaulted at USP Victorville for this reason and anticipated a

3   further assault, and the prison staff at USP Victorville refused to place him in the

4   SHU although he has conveyed his concerns to them (Lee Decl., Ex. 5 at 102-05;

5   P's Exs. 50-52); and (2) the declaration of inmate Guzman-Garcia, who stated he

6   wrote a letter to McFadden warning him that plaintiff would be killed soon.  P's

7   Ex. 9.  As discussed above, the court has found this evidence sufficient to create a

8   triable issue as to whether defendant McFadden was aware plaintiff faced a

9   substantial risk of serious harm.  But the question of whether defendant McFadden

10  is nonetheless entitled to qualified immunity is somewhat different.

11      "Even though the constitutional issue turns on the officers' state of mind

12  (here, deliberate indifference to a substantial risk of serious harm), courts must

13  still consider whether – assuming the facts in the injured party's favor – it would

14  be clear to a reasonable officer that his conduct was unlawful." *Ford*, 301 F.3d at

15  1045.  Thus, the question here is whether the law was clearly established that

16  receiving letters with such information as defendant McFadden is alleged to have

17  received would be sufficient to alert McFadden that his failure to intervene at USP

18  Victorville would be unlawful.  The court finds that it was not.

19      First, given that defendant McFadden was not present at USP Victorville

20  and had no background information regarding or interaction with plaintiff, the law

21  was not clear that the information he allegedly received by letter was sufficient to

22  elevate the risk of danger plaintiff faced to "substantial risk of serious harm." *See*

23  *id.* at 1051 (neither *Farmer* nor subsequent authorities has fleshed this out).

24  Although the warnings in the letters were explicit, given that defendant McFadden

25  would have received them in a vacuum, it is questionable whether they were

26  sufficient by themselves to alert McFadden that the risk of serious harm to

27  plaintiff was substantial.  The court cannot say that existing precedent placed this

28

1    question "beyond debate." *See al-Kidd*, 131 S. Ct. at 2083.

2         Second, given that defendant McFadden was not present at USP Victorville,

3    his duty to specifically protect plaintiff was less clear.  The parties have not cited,

4    and the court is not aware, of any law establishing that a Regional Director such as

5    McFadden would be liable in these circumstances.  As such, the court cannot say

6    that "every reasonable official" in defendant McFadden's position would have

7    understood that his failure to intervene at USP Victorville after receiving the

8    letters violated plaintiff's constitutional rights.  *See Reichle*, 132 S. Ct. at 2093.

9    Of course, there need not be a case right on point if the unlawfulness of defendant

10   McFadden's conduct was "apparent" in light of the law that did exist (*see Nelson*,

11   685 F.3d at 883-84), but under these circumstances, the court finds that it was not

12   apparent that any failure to act by McFadden given the information available to

13   him constituted a violation of plaintiff's Eighth Amendment rights.

14        Accordingly, defendant McFadden is entitled to qualified immunity.

15        **2.    Defendant Norwood Is Not Entitled to Qualified Immunity**

16        Plaintiff presented disputed evidence in support of his claim against

17   defendant Norwood.  That which the court finds relevant and admissible is

18   principally plaintiff's deposition testimony that he informed defendant Norwood

19   in multiple in-person conversations that he had been assaulted in a previous

20   institution and believed a further assault was inevitable because inmates were in

21   the process of seeking documentation to verify whether plaintiff had cooperated

22   with law enforcement, and that plaintiff had relayed his concerns to his counselor

23   but his counselor was not responding.  Lee Decl., Ex. 5 at 160-61.  Plaintiff further

24   testified that defendant Norwood asserted that it was the policy of the prison that a

25   person would not be moved into the SHU until he was actually assaulted, and that

26   they argued about this, but Norwood said plaintiff would not be receiving special

27   treatment.  *Id.* at 161-62.  There is also a declaration from plaintiff's mother

28

29

1  stating she called defendant Norwood in early March 2008 and told him her son

2  was in danger (P's Ex. 10); however, the court finds this very generalized

3  information would not reasonably have caused defendant Norwood to find

4  plaintiff faced a substantial risk of serious harm.

5       Again, the court recognizes that the Ninth Circuit has found there is a lack

6  of authority fleshing out the point at which the risk of inmate assault becomes

7  sufficiently substantial.  *See Ford*, 301 F.3d at 1051.  Nonetheless, the court finds

8  that defendant Norwood's circumstances differ from defendant McFadden's in a

9  number of material respects such that, even without authority on point, it should

10  have been apparent to defendant Norwood that his failure to take action to protect

11  plaintiff was unconstitutional, assuming the truth of plaintiff's testimony.

12       First, unlike defendant McFadden, defendant Norwood was present at and

13  directly responsible for USP Victorville.  Although he was not the primary point

14  of contact for an inmate facing a safety threat, upon being told by an inmate that

15  his counselor was not responding to his safety concerns, at a minimum the warden

16  would have been obligated to look into this matter further, but there is no

17  indication that defendant Norwood did so here.  *See Reece v. Groose*, 60 F.3d 487,

18  491 (8th Cir. 1995) ("The duty to protect prisoners from violence at the hands of

19  other prisoners requires prison officials to take reasonable measures to abate

20  substantial risks of serious harm, of which the officials are aware.") (citing

21  *Farmer*, 511 U.S. at 847).

22       Second, defendant Norwood would have had access to plaintiff's central file

23  and other information that would have allowed him to evaluate and consider

24  plaintiff's claims that other inmates were in the process of verifying that plaintiff

25  had cooperated with law enforcement in the past.  That an inmate who has

26  cooperated faces a substantial risk of assault would have been well known to

27  defendant Norwood.  *See Reece*, 60 F.3d at 491 (denying qualified immunity the

28

substantial risk of harm faced by an inmate who was known as a "snitch" to both inmates and prison staff was "obvious").

Third, according to plaintiff, defendant Norwood told him he would not be moved into the SHU for his protection unless and until he was actually assaulted, per prison policy. The unlawfulness of such a policy should have been apparent to defendant Norwood. *Farmer* clearly established that prison officials have a duty under the Eighth Amendment to take reasonable measures to protect prisoners from violence at the hands of other prisoners, and that duty is triggered when a prisoner faces a substantial risk of serious harm. *Farmer*, 511 U.S. at 832-34. No reasonable official could have believed the law imposed no duty to act until the prisoner was actually assaulted.

The court recognizes that defendant Norwood vigorously disputes plaintiff's allegations. But this dispute must be resolved by the trier of fact. Viewing the evidence in the light most favorable to plaintiff, defendant Norwood is not entitled to qualified immunity.

### 3. Defendant Prieto Is Not Entitled to Qualified Immunity

In support of his claim against defendant Prieto, plaintiff has presented disputed evidence that: (1) Prieto admitted to plaintiff that he gave plaintiff's cellmate a copy of plaintiff's administrative remedy response, and reminded plaintiff that he had previously told plaintiff he "needed to be careful what [he] wrote because [he] could end up in a bag" (Lee Decl., Ex. 5 at 138-39); and (2) after plaintiff was assaulted in April 2008, Prieto told plaintiff, "See what happens when you write so much shit." P's Ex. 6, ¶ 6. In addition, it is undisputed that defendant had access to plaintiff's intake form stating plaintiff had previously assisted law enforcement and testified in court. Prieto Decl., ¶ 10, Ex. A at 7.

Assuming the truth of plaintiff's testimony, this would tend to show that defendant Prieto not only knew of and explicitly acknowledged the substantial risk

1  of serious harm plaintiff faced because of what he wrote, but that Prieto in fact

2  facilitated the assault by providing plaintiff's cellmate with an administrative

3  response revealing plaintiff was a homosexual who had cooperated with law

4  enforcement.  This is not a close case for qualified immunity.  The unlawfulness of

5  such conduct would have been apparent to any prison official.  *See Irving v.*

6  *Dormire*, 519 F.3d 441, 451 (8th Cir. 2008) (denying qualified immunity where a

7  prison guard falsely labeled an inmate as a snitch, concluding the guard was on

8  fair notice that an inmate labeled as a snitch faces substantial risk of serious harm

9  because, "after all, who better knows the opprobrium and consequent effect

10  thereof that attaches to the label of snitch than those who work daily within the

11  inmate population").

12       Again, the court recognizes that defendant Prieto disputes this testimony.

13  But viewing it in the light most favorable to plaintiff, defendant Prieto is not

14  entitled to qualified immunity.

15       **4.    Defendant Halstead Is Not Entitled to Qualified Immunity**

16       Plaintiff testified at his deposition that defendant Halstead was present

17  during his intake classification interview on February 15, 2008.  Lee Decl., Ex. 5

18  at 176.  It is undisputed that on plaintiff's intake form, plaintiff stated he had

19  previously assisted law enforcement and testified in court, but denied being a gang

20  member and stated he knew of no reason that he should not be placed in general

21  population.  Lee Decl., Ex. 3 at 4.  In addition, the interviewer noted on the form

22  that plaintiff was not OK for general population, subject to review by the Captain.

23  *Id.*  Plaintiff testified that during the interview he told defendant Halstead that

24  members of his former gang would assault or kill him if he were placed in the

25  general population, once they obtained information verifying his prior

26  cooperation.  Lee Decl., Ex. 5 at 173-76.  Defendant Halstead told plaintiff that

27  while he understood plaintiff's concerns, he was not going to take any action on

28

1    plaintiff's request to be segregated until he was actually assaulted. *Id.* at 173.

2    As discussed above, this information indicates defendant Halstead was

3    aware of a risk to plaintiff's safety. But it is doubtful whether this would be

4    sufficient to get past qualified immunity if this were the only evidence against

5    defendant Halstead.

6    Plaintiff also gave additional testimony, however, indicating defendant

7    Halstead was aware that plaintiff was assaulted in late March 2008 but still refused

8    to place him in the SHU. Plaintiff testified that defendant Halstead photographed

9    plaintiff's injuries after he was assaulted in late March 2008, although plaintiff

10   does not clearly state what, if anything, he told Halstead about how he was

11   injured. Lee Decl., Ex. 5 at 173-74. Plaintiff does not testify that he ever told

12   defendant Halstead he was assaulted. Instead, he asserts that defendant Halstead

13   must have known because another officer who worked in the housing unit

14   provided a letter plaintiff wrote to his mom notifying her of the assault, and a letter

15   from inmate Stone stating plaintiff "was going to be assaulted again." *Id.* at 173-

16   74. Plaintiff further testified that defendant Halstead interviewed him, the officer

17   who worked in the housing unit, and inmate Stone after the assault, suggesting

18   that Halstead at least suspected plaintiff had been assaulted. *See id.* at 174.

19   Plaintiff also testified that at that time he again requested transfer to the SHU, and

20   defendant Halstead again denied plaintiff's request. *Id.*

21   Viewing the evidence in the light most favorable to plaintiff, defendant

22   Halstead first learned at plaintiff's intake that plaintiff had previously cooperated

23   with law enforcement and believed members of his former gang would assault or

24   kill him if he were placed in general population, and then some weeks later

25   investigated an apparent assault that plaintiff actually suffered and still refused to

26   place him in the SHU. Taken together, this is sufficient to establish that defendant

27   Halstead was aware of a substantial risk of serious harm to plaintiff, even given

28

the lack of legal guidance on this issue as discussed in *Ford*. Further, like
defendant Norwood, defendant Halstead allegedly told plaintiff he would not
move him to the SHU unless he was actually assaulted – a plainly unconstitutional
policy. *See Farmer*, 511 U.S. at 832-34. No reasonable official could have
believed the law imposed no duty to act until the prisoner was actually assaulted.
Moreover, defendant Halstead did not simply advise plaintiff of this policy at his
intake, but again refused to move him even after he was confronted with evidence
that plaintiff was actually assaulted. If proved, this is deliberate indifference in
clear violation of the Eighth Amendment, and the law was sufficiently established
to make this apparent to defendant Halstead.

The court recognizes that defendant Halstead disputes plaintiff's testimony
that Halstead knew anything about a March assault on plaintiff. But viewing the
evidence in the light most favorable to plaintiff, defendant Halstead is not entitled
to qualified immunity.

### 5.   Defendant Bourn Is Entitled to Qualified Immunity

The primary relevant evidence plaintiff presents against defendant Bourn is
much the same as the first part of the evidence against defendant Halstead.
Plaintiff testified at his deposition that both defendants Halstead and Bourn were
present during his intake classification interview on February 15, 2008. Lee Decl.,
Ex. 5 at 176. Again, it is undisputed that on plaintiff's intake form, plaintiff stated
he had previously assisted law enforcement and testified in court, denied being a
gang member, stated he knew of no reason that he should not be placed in general
population, and the interviewer noted on the form that plaintiff was not OK for
general population, subject to review by the Captain. Lee Decl., Ex. 3 at 4.
Plaintiff testified that during the interview he told defendants Halstead and Bourn
that members of his former gang would assault or kill him if he were placed in the
general population, once the gang members obtained information verifying his

prior cooperation. Lee Decl., Ex. 5 at 173-76, 190. Like defendant Halstead,
defendant Bourn indicated during this interview that the prison policy was not to
move inmates to the SHU until they were actually assaulted. *Id.* at 191.

There is no question that this is information that indicates defendant Bourn
was aware of a risk to plaintiff's safety. But again, the question is whether the law
was clearly established such that he must have known from this information that
plaintiff faced a substantial risk of serious harm and his failure to segregate him
would be unlawful. The court is not aware of any law holding that all former gang
members who have cooperated must be placed in segregated housing. Defendant
Bourn received this information at plaintiff's initial interview, the day after he
arrived at the prison. The information plaintiff provided was sufficient to raise
only general concerns of harm, with no indication of any specific threat within the
prison. Although defendant Bourn may have misjudged the severity of the risk
plaintiff faced, "a reasonable prison official understanding that he cannot
recklessly disregard a substantial risk of serious harm, could know all the facts yet
mistakenly, but reasonably, perceive that the exposure in any given situation was
not that high. In these circumstances, he would be entitled to qualified immunity."
*Ford*, 301 F.3d at 1050 (citation omitted).

As discussed above, the alleged policy of not moving inmates to the SHU
unless they were actually assaulted is plainly not constitutional. But defendant
Bourn allegedly told plaintiff this only at his initial interview when, as just
discussed, there was not sufficient information to unquestionably indicate plaintiff
faced a substantial risk of serious harm. Moreover, plaintiff testified that
defendant Bourn told plaintiff that "he [Bourn] was not going to move me
[plaintiff] to SHU, but that he would be open to listening to anything I had to say
on the subject at any time in the future." Lee Decl., Ex. 5 at 191. Thus, in contrast
to plaintiff's reported arguments with defendant Norwood on this topic, there is no

35

1   evidence that defendant Bourn flatly refused to entertain the possibility of

2   segregating plaintiff prior to an actual assault.  And in contrast to defendant

3   Halstead, there is no evidence that defendant Bourn continued to refuse to place

4   plaintiff in the SHU even after it appeared plaintiff had been assaulted.

5        The only additional piece of evidence plaintiff offers against defendant

6   Bourn is plaintiff's mother's declaration that she called the prison and spoke with

7   defendant Bourn in early March 2008 and told him plaintiff was in danger and

8   needed to be moved to the SHU.  P's Ex. 10.  But this information is far too

9   general and vague to have caused defendant Bourn to shift his assessment of the

10  risk plaintiff faced to the level of substantial risk of serious harm.  *See Butera v.*

11  *Cottey*, 285 F.3d 601, 606-07 (7th Cir. 2002) (detainee's statements to correctional

12  officers that he was having "problems in the block" and needed to be moved, and

13  detainee's mother's telephone call stating other detainees had threatened her son

14  with sexual assault, were insufficient to give notice of specific risk of serious

15  harm).

16       In sum, the court finds that the only real information defendant Bourn

17  received about a risk to plaintiff's safety was the information plaintiff claims to

18  have provided in his intake interview.  This information and the existing law were

19  insufficient to put defendant Bourn on notice that his failure to segregate plaintiff

20  would be "clearly unlawful."  *See Saucier*, 533 U.S. at 202.  As such, defendant

21  Bourn is entitled to qualified immunity.

22  //

23  //

24  //

25

26

27

28

36

**VI.**

**RECOMMENDATION**

IT IS THEREFORE RECOMMENDED that the District Court issue an Order: (1) approving and accepting this Report and Recommendation; (2) denying plaintiff's cross motion for partial summary judgment; (3) denying defendants' motion for summary judgment as to defendants Norwood, Prieto, and Halstead; (4) granting defendants' motion for summary judgment in favor of defendant McFadden, and thereby dismissing defendant McFadden from this action; and (5) granting defendant Bourn's motion for summary judgment, and thereby dismissing defendant Bourn from this action.

DATED: September  30, 2014

SHERI PYM
United States Magistrate Judge

37